UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| JAEDAN MOTON and ALONZO MOTON, | Civil No. 20-1201 (JRT/LIB) |
| Plaintiffs, | |
| v. | **MEMORANDUM OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** |
| PARK CHRISTIAN SCHOOL and CHRIS NELLERMOE, I*ndividually and as Principal of Park Christian School* | |
| Defendants. | |

---

David J.T. Chapman, **D.J. CHAPMAN LAW, PC**, 3155 Bluestem Drive, PMB #388, West Fargo, ND 58078, for plaintiffs.

Jason M. Stoffel, Lindsey J. Woodrow, and Peter M. Waldeck, **WALDECK & WOODROW, PA**, 121 South Eighth Street, Suite 1400, Minneapolis, MN 55402, for defendants.

Defendants, Park Christian School ("PCS") and Chris Nellermoe, Principal of PCS, have moved for summary judgment in this action. Plaintiffs Jaedan and Alonzo Moton, father and son, brought this action alleging that Defendants racially discriminated against them by requiring them to sign "academic contracts" in order to have Jaedan admitted as a student when the same was not required of similarly situated white students. Because the Court finds that the Motons did not establish jurisdiction or provide evidence establishing Defendants' discriminatory intent, the Court will grant Defendants' Motion for Summary Judgment.

## BACKGROUND

**I.   FACTUAL BACKGROUND**

PCS is a private religious school in Moorhead, Minnesota and Alonzo Moton and his wife, Joleen Moton, enrolled Jaedan at the school in 2014. (Defs.' Mem. Supp. Summ. J. at 1, May 27, 2021, Docket No. 40.) When Jaedan was initially enrolled, he was 12 years old and came to PCS as an average to below-average student from the West Fargo Public School System.[1]  (Pls.' Mem. Opp. Summ. J. at 2, June 18, 2021, Docket No. 51.) Given Jaedan's struggling academics, the Motons were looking for a fresh start and believed that enrolling at PCS was a perfect opportunity for Jaedan to repeat the seventh grade and get back on track without his reputation being known to other students. (*Id*. at 17.) Moreover, one of Jaedan's summer basketball teammates, Connor Kvalvog, was a seventh grader at PCS and Connor's parents had offered to pay for Jaedan's PCS tuition if he enrolled. (Moton Ex., Affidavit of Ray Kvalvog ("Kvalvog Aff.") at ¶2, June 18, 2021.) Repeating seventh grade would therefore also align the Motons' and Kvalvogs' interests in keeping the basketball teammates together.

---

[1] The parties disagree on the characterization of Jaedan's age at the beginning of the school year. The Motons claim Jaedan was too young to be placed in eighth grade at PCS and that PCS' decision to place him in seventh grade was racially motivated. Defendants contend that the Motons are obscuring the facts and ignore that Jaedan's birthday is August 31, 2001, and that Jaedan turned 13, the traditional age of an eighth grader, days after the start of the school year.

Although Jaedan enrolled at PCS in 2014, the Motons initially applied to enroll their son in 2012.[2] (Decl. Michael Levang Supp. Mot. Summ. J., Ex. 2, May 27, 2021, Docket No. 42.) When the Motons first applied, Jaedan had a litany of learning disabilities as well as an active Individual Education Plan ("IEP") to ensure that he received the proper services and support required to help him succeed academically. (Decl. Eva Riendeau, Ex. A., May 27, 2021, Docket No. 43.) Notably though, the 2012 application failed to disclose the existence of any special educational needs or that Jaedan had an active IEP. (Levang Decl., Ex. 2.) The Motons claim that the failure to disclose was due to the application being completed in July of that year when Jaedan was not receiving any services because there was no school.[3] (Pls.' Mem. Opp. Summ. J. at 6.) Defendants maintain that, due to the deficiencies in the Motons' application, they did not have knowledge of an active IEP

---

[2]The Motons maintain that they filled out an application in both 2012 and 2014. (Pls.' Mem. Opp. Summ. J. at 1.) However, neither PCS nor Plaintiffs have produced a 2014 application.

Regardless, the top of the 2012 application has been altered and it appears that "8th" is hand-written over "6th" in the section denoting what grade an applicant is applying for. (Decl. Michael Levang Supp. Mot. Summ. J., Ex. 2, May 27, 2021, Docket No. 42.) Defendant and PCS Principal Chris Nellermoe described that a handwritten alteration would have been a normal practice for renewed applications. (Decl. Jason M. Stoffel Supp. Mot. Summ. J., Ex. D at 11:3–25, May 27, 2021, Docket No. 41.) The 2012 application is therefore the only operative and available application in this action.

[3]The Motons also argue that PCS received Jaedan's education records—including his IEP—and conducted a review regardless of their alleged failed disclosure. (Pls.' Mem. Opp. Summ. J. Mot. at 2.) To support their assertion, Plaintiffs cite to an August 10, 2012 email to Katherine Kvalvog that allegedly shows that PCS had obtained Jaedan's records and were aware of his IEP. (*Id*. at 6.) However, the Court is unable to find in the CM/ECF system either a declaration or affidavit from Katherine Kvalvog that contains the alleged communication. Additionally, the Motons appear to contradict themselves by agreeing that the Defendants did not have Jaedan's academic records before admitting him to PCS. (Pls.' Mem. Opp. Summ. J. at 7.)

before admitting Jaedan for the 2014-2015 academic school year. (Levang Dec. Ex. 5.) Specifically, Defendants argue that it was not until 2014 that PCS staff discovered that Jaedan was assessed to have a learning disability in 2012. (Riendeau Decl., Ex. B; Lavang Decl., Ex. 3–5; Stoffel Decl. Ex. E at 21:2– 9.) Upon discovery, PCS sought confirmation from Jaedan's former school district. (*Id.*)

PCS, as a private religious school, is neither funded for nor required to provide special education related services. (Defs.' Mem. Supp. Summ. J. at 1); 34 C.F.R. § 300.137(a) ("No parentally-placed private school child with a disability has an individual right to receive some or all of the special education and related services that the child would receive if enrolled in a public school.") Despite PCS' limitations, students are still able to attend PCS and receive special education services through the Moorhead Public School District. (Levang Decl., Ex. 5.) Students and their families may also choose to work with PCS to receive extra accommodations to account for the burdens of their disabilities. (*Id*.)

After PCS became aware of Jaedan's IEP, PCS staff sent correspondence to Jaedan's parents regarding his disabilities. (*Id.*) PCS presented the Motons with three possible future scenarios for Jaedan, including: (1) re-enrolling in public school; (2) bussing to public school for part of each day to receive special education; and (3) waiving Jaedan's IEP services and staying at PCS with whatever support could be provided. (*Id*.) The

Motons chose the third option and kept Jaedan enrolled at PCS while waiving his IEP services. (Levang Decl., Ex. 6.)

Despite the new environment, Jaedan continued to struggle academically and received five Fs and one D during his first quarter at PCS. (Levang Decl., Ex. 8.) Per PCS' policies, new students were required to maintain a Grade Point Average ("GPA") of 2.0 during a nine-week academic probation period. (Levang Decl., Ex. 9.) Clearly, Jaedan's performance did not meet this standard. However, PCS decided to extend the traditional academic probation period for Jaedan in order to determine if he was a fit for the school. (Levang Decl., Ex. 9.) During the second quarter, Jaedan still could not meet the required threshold and received a 1.70 GPA. (*Id*.) Because Jaedan was well below the probationary GPA threshold, PCS met with the Motons to discuss Jaedan's struggles and future with the school. (*Id*.) As a result of the meeting, PCS and the Motons executed an Expectations and Accommodation Plan ("Accommodation Plan"). (Levang Decl., Ex. 10.) The Accommodation Plan provided that PCS would allow Jaedan to take Bible tests as open note tests, that Support Services Teacher Eva Riendeau would work with Jaedan every day, and that Jaedan would be provided with classroom accommodations including preferred seating, completed notes and study guides, quiet testing environments, an extra set of textbooks to keep at home, and the ability to have test questions read out loud to him. (*Id*.)

At the end of the third quarter, PCS provided an assessment of Jaedan's progress, determined that it could not meet his needs, but decided to extend his probationary period for a third time through the end of the fourth quarter. (Levang Decl., Ex. 13.) To incentivize Jaedan's independent learning, PCS decided to amend the Accommodation Plan so that he would no longer receive completed notes and study guides. (*Id*.) Despite PCS being willing to extend the probationary period, both the Motons and Kvalvogs—who had been acting as representatives for the Motons—refused to sign the Accommodation Plan. (*Id*.) The Motons and Kvalvogs then went a step further and asked PCS to remove Jaedan's tutoring accommodations because they "[would] keep Jaedan on track and if [they] don't and he fail[ed] out of PCS then that is what the good LORD intended." (Levang Decl., Ex. 14.)

At the conclusion of the academic year, Jaedan had a cumulative GPA of 1.33. (Levang Decl., Ex. 18.) On June 15, 2015, PCS informed the Motons that Jaedan would not be eligible to re-enroll at PCS for the next school year. (*Id*.)

## II.  PROCEDURAL HISTORY

The Motons commenced this action against Defendants on May 19, 2020. (Compl., May 19, 2020, Docket No. 2.) On August 4, 2020, the Court issued its Pretrial Scheduling Order. (Pretrial Scheduling Order, Aug, 4, 2020, Docket No. 12.) Pursuant to this Order, all motions to amend the pleadings were required to "be filed and the Hearing thereon completed on or before August 31, 2020." (*Id*. at 2.) On May 27, 2021, Defendants filed

the current Motion for Summary Judgment and raised, among other issues, the Motons' failure to establish that the Court has subject matter jurisdiction over the case. (Defs.' Mot. Summ. J., May 27, 2021, Docket No. 38.)

On June 18, 2021, the Motons responded to the allegation in the Defendants' motion by filing a motion to amend. (Pls.' Mot. Amend, June 18, 2021, Docket No. 45.) In their motion, the Motons sought to amend their Complaint to assert additional facts in support of their claim, correct certain "typographical" errors related to their alleged basis for subject matter jurisdiction, and to remove from the Complaint any reference to 42 U.S.C. § 1983. (Mem. Supp. Pls.' Mot. Amend, June 18, 2021, Docket No. 47.) The Motons also acknowledged that their motion was untimely under the scheduling Order but requested that the Order be amended. (*Id*. at 2-11.)

The Magistrate Judge assigned to the Motion to Amend denied the Motons' request to amend both their pleadings and the Scheduling Order. (Order Denying Mot. Amend, Aug. 10, 2021, Docket No. 64.) The Magistrate Judge held that because the Motons had been placed on notice since June 9, 2020—the day Defendants filed their Answer—of the alleged jurisdictional defects and did nothing about it for over a year they could not amend. (*Id.* at 7–8.) The Magistrate Judge also found that the Motons' Motion to Amend was filed as a response to Defendants' Motion for Summary Judgment and, as such, the Defendants would be unfairly prejudiced if the Court were to grant the motion. (*Id*. at 11.)

-7-

The Court must now consider the Defendants' Motion for Summary Judgment.

## DISCUSSION

### I. STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material fact, and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party may not rest on mere allegations or denials but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial. *Anderson*, 477 U.S. at 256 (discussing Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

### II. ANALYSIS

Defendants' Motion for Summary Judgment raises six issues for the Court to consider: whether (1) the Motons' Complaint should be dismissed for failure to establish

jurisdiction; (2) the Motons' purported 42 U.S.C. § 1983 claim fails as a matter of law because this case involves no State or Governmental actors; (3) the Motons' 42 U.S.C. § 1981 claim fails as a matter of law because there is no evidence that PCS or its Principal discriminated against the Motons; (4) the Motons' Complaint is time-barred by the statute of limitations; (5) claims against Chris Nellermoe in his individual capacity should be dismissed if this case survives summary judgment; and (6) any punitive damages claim should be dismissed if this case survives summary judgment.[4] Because the Court will find that the Motons' Complaint should be dismissed for lack of jurisdiction and, alternatively, that their § 1983 and § 1981 claims cannot not withstand the summary judgment motion, the Court will decline to reach the issues regarding the statute of limitations, Nellermoe's dismissal in his individual capacity, and punitive damages.

### A. Failure to Establish Jurisdiction

Defendants argue that the Motons have not met their burden of establishing subject matter jurisdiction. The Motons have conceded that their pleadings wrongly

---

[4] In addition to the six issues raised by the Motion for Summary Judgement, Defendants argue that the Motons' brief was submitted a day late and request that the Court either strike the response or not permit oral argument. (Defs.' Reply Mem. Supp. Summ. J. Mot. at 2, June 1, 2021, Docket No. 56.)

"The District's local rules permit the Court, among other things, to take any action the Court considers appropriate when a party fails to timely file and serve a memorandum of law." *Bailey v. Metro. Council*, 2019 WL 4687040, at *1 (D. Minn. Sept. 26, 2019). This includes taking no action. The Motons' filing of the memorandum a day late is not so egregious that it warrants any sanction from the Court.

assumed that the applicable statutes provided their own basis for jurisdiction and that "it is clear that the Moton Complaint is defective." (Pls.' Mem. Supp. Mot. Amend at 2, 16.)

A federal court has a duty to assure itself that it has subject matter jurisdiction in each case. *Sanders v. Clemco Indus.*, 823 F.2d 214, 216 (8th Cir. 1987). Failure to plead federal jurisdiction is grounds for dismissal. *Dep't of Rec. & Sports of Puerto Rico v. World Boxing Ass'n*, 942 F.2d 84, 90 (1st Cir. 1991) (instructing district court to dismiss complaint for want of jurisdiction for failure to plead subject matter jurisdiction in the complaint); Fed. R. Civ. P. 8(a)(1) (requiring a "short and plaint statement of the grounds for the court's jurisdiction[.]").

The Motons' Complaint pleads that "[t]he Court has jurisdiction over this action pursuant to 28 U.S.C. § 1334, 42 U.S.C. § 1983 and 42 U.S.C. § 1981 (1977)." (Compl. at ¶ 5.) As Defendants correctly point out, neither 42 U.S.C. § 1983 nor § 1981 confer federal district court jurisdiction and 28 U.S.C. § 1334 confers the federal district court "original and exclusive jurisdiction of all cases under title 11 [the bankruptcy code]." Because 42 U.S.C. § 1983 and § 1981 do not provide for an independent basis for subject matter jurisdiction, claims under each statute require invocation of federal question jurisdiction under 28 U.S.C. § 1331. *See* 42 U.S.C. §§ 1981, 1983; *see also Thomas v. St. Luke's Health Sys.*, 869 F. Supp. 1413, 1425 (N.D. Iowa 1994) (finding that § 1981 claim should be dismissed for want of federal question when jurisdiction under § 1331 was not pled); *Cabell v. Chavez–Salido,* 454 U.S. 432, 434 n. 4 (1982) (district court correctly

concluded plaintiffs stated a claim under 42 U.S.C. § 1981, with jurisdiction in the federal district court under 28 U.S.C. § 1331).

The Motons have not established jurisdiction because they have failed to plead federal question jurisdiction under § 1331. Section 1331 is mentioned nowhere in their Complaint. Moreover, the Motons were on notice of the jurisdictional defect and did not attempt to correct the issues until Defendants' current motion seeking summary judgment. The Court therefore concludes that the Motons' Complaint must be dismissed for want of a federal question. Alternatively, the Court addresses the merits of the Defendants' motion for summary judgment.

### B. § 1983 Claim

Despite the Motons' initial Complaint, both the Motons and Defendants now agree that a § 1983 claim is not appropriate in this case. (Defs.' Mem. Supp. Summ. J., at 14–15; Pls.' Mem. Opp. Summ. J., at 12.)

"The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992) (citing *Carey v. Piphus*, 435 U.S. 247, 254-257 (1978)). "Only state actors can be held liable under Section 1983." *Youngblood v. Hy-Vee Food Stores, Inc.*, 266 F.3d 851, 855 (8th Cir. 2001). The United States Supreme Court has held that despite receiving government funding, being regulated by the state, performing a function which benefits the public, and having

a certain fiscal relationship with the state, a private school is not a state actor and is not subject to § 1983 claims. *See Rendell-Baker v. Kohn*, 457 U.S. 830 (1982).

Thus, even if the Motons had established jurisdiction, their § 1983 claim against PCS could not survive summary judgment because neither the school nor its principal are state actors and the claim would be dismissed.

### C. § 1981 Claim

Defendants next argue that the Motons' § 1981 claim cannot survive summary judgment because the record is devoid of facts that establish a prima facie case under the statute. Predictably, the Motons disagree and specifically point to the following facts: (1) the alleged "academic contracts" they were required to sign; (2) PCS' decision to place Jaedan in eighth, rather than seventh, grade; (3) Defendants' failure to adhere to its regular policies and procedures; and (4) an alleged racial slur used by Nellermoe. They assert that these facts establish a prima facie case under § 1981.

Claims of race discrimination under § 1981 are analyzed under the *McDonnell Douglas* burden-shifting framework. *McDonnell–Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973); *Patterson v. McLean Credit Union,* 491 U.S. 164, 186 (1989) (applying framework to claims under 42 U.S.C. § 1981). Under *McDonnell–Douglas,* the plaintiff is first required to establish a prima facie case of discrimination. *McDonnell–Douglas,* 411 U.S. at 802. The burden of production then shifts to defendant to assert a legitimate reason for the allegedly discriminatory action. *Id*. If the defendant is able to provide a legitimate reason,

the burden shifts back to the plaintiff to establish that the asserted legitimate reason was merely a pretext for a discriminatory action. *Id.* at 804.

"A plaintiff establishes a prima facie case under § 1981 by showing (1) membership in a protected class; (2) the intent to discriminate on the basis of race on the part of the defendant; and (3) discrimination interfering with a protected activity[.]" *Daniels v. Dillard's, Inc.*, 373 F.3d 885, 887 (8th Cir. 2004). To successfully plead a claim under § 1981, a plaintiff must allege sufficient facts to show the defendant acted with discriminatory intent. *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 469 (8th Cir. 2009); *Dirden v. U.S. Dept. of Hous. & Urban Dev.*, 86 F.3d 112, 114 (8th Cir. 1996). Discriminatory intent implies that the defendant "elected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Spirit Lake Tribe of Indians ex rel. Comm. of Understanding and Respect v. Nat'l Collegiate Athletic Ass'n,* 715 F.3d 1089, 1092 (8th Cir. 2013) (quoting *Personnel Adm'r of Moss v. Feeney*, 442 U.S. 256, 279 (1979)).

Because the Motons have alleged that they were discriminated against for being African Americans and that the discrimination occurred while Jaedan was pursuing his education, the central issues before the Court are whether any of the four facts proffered by the Motons sufficiently establishes the Defendants' discriminatory intent and, if so, whether there was a legitimate reason for the Defendants' actions.

### 1. Alleged "academic contracts"

First, the Motons have been less than clear about what "contracts" they are referencing when discussing the "academic contracts" at issue. At one point, the Motons claim that the contract between the parties was the "offer by the Motons to have Jaedan attend PCS" which was accepted by PCS and the consideration was the Kvalvogs' payment of Jaedan's tuition. (Pls.' Mem. Opp. Summ. J. Mot. at 30-31.) At other times, the Motons regularly refer to the imposition of "academic contracts" that were distinct from the Accommodation Plans. (*Id*. at 15.)

The Motons' first type of "contract" is nothing more than a red herring. Even assuming that the Motons' characterization was accurate and that the Defendants accepted their offer to have Jaedan attend PCS, the Court cannot conclude that accepting Jaedan as a student is indicative of the Defendants' discriminatory intent. Regarding the other alleged academic contracts, the Motons have failed to do anything other than allude to the existence of such contracts without ever describing the contracts' terms or how they differed from the Accommodation Plans and have failed to produce copies of the alleged contracts. In sum, the Motons' entire claim is that they were forced to sign contracts that put harsher restrictions on Jaedan than on other similarly situated students, but the Motons cannot point to the contracts' terms, any onerous effect on Jaedan, or that the contracts existed in the first place.[5] The alleged existence of academic

---

[5] The Motons have also failed to establish that there are any similarly situated students—white students with an extensive IEP—at PCS. At most, the Motons claimed to have talked with two other PCS students with unknown academic conditions that did not have to sign "academic contracts." (Stoffel Decl., Ex. B, at 135:17–136:8.)

contracts, with not even a modicum of evidence in support of the assertion, is insufficient to establish the Defendants' discriminatory intent.

Even while viewing the facts in the light most favorable to the Motons as the non-moving party, their claim fails to establish a prima facie case.

### 2. Defendants' Decision to Place Jaedan in Eighth Grade

Turning to the Motons' second category of evidence supporting their prima facie case, the Court is not persuaded that Defendants' decision to place Jaedan in eighth, and not seventh grade, was racially motivated. The Motons heavily rely on the fact that Jaedan was twelve on the first day of school but fail to acknowledge that he turned thirteen a few days after the start of the school year on August 31.[6] Additionally, Defendants sufficiently and reasonably explained that "grade retention is never anything that is done lightly" and that Light's Retention Scale—a tool for measuring the costs and the benefits of grade retention—"showed that this was not an optimum situation to do a retention beyond the fact that [Jaedan] had completed and passed seventh grade." (Stoffel Decl. Ex. E, at 23). The Motons' conclusory allegations of racial motivation based on the decision not to allow Jaedan to retake the seventh grade do not, on their own, establish the Defendants' discriminatory intent. Moreover, even if the Court were to

---

[6]Although Jaedan is on the younger side of his peers, he was nonetheless thirteen and within the same traditional age group of other eighth grade students. *See* Minn. Stat.§ 124D.02 (prescribing that "[a]ll children to be eligible for kindergarten must be at least five years of age on September 1 of the calendar year in which the school year commences.").

assume that refusing to place Jaedan in seventh grade did establish the requisite intent, it is clear that Defendants articulated a legitimate, nondiscriminatory reason for doing so and the Motons have failed to offer any evidence that the use of Light's Retention Scale was pretextual.

### 3. Defendants' Alleged Deviation from Regular Policies and Procedures

The Motons' third argument asserts that Defendants did not follow the grade retention criteria contained in the PCS policy handbook and that the school and its officials were negligent in not obtaining Jaedan's records before admitting him.  (Pls.' Mem. Opp. Summ. J. Mot. at 21.)  This argument is misplaced and must fail.

First, the Motons appear to be ensnared in their own entangled arguments.  The Motons simultaneously claim that Defendants knew of and reviewed Jaedan's records and IEP in 2012 when the Motons first applied but also claim that PCS did not procure his records before admitting him in 2014.  (*Compare id*. at 1–2, *with id*. at 21.)  Further, the Motons' argument that the Defendants were "negligent" in allegedly not procuring Jaedan's records before admitting him and that this **negligence** is somehow transmuted into **intentional** discrimination is a legal oxymoron and does not persuade the Court.

Second, assuming arguendo that the Motons are correct that Defendants did not strictly adhere to every relevant internal policy, that fact alone would not establish an intent to racially discriminate.  For example, even if the Motons are correct that

Defendants used a different process to determine whether Jaedan should be placed in seventh or eighth grade, the Defendants' testimony regarding the use of Light's Retention Scale makes clear that they did not elect to place Jaedan in eighth grade because of its adverse effects on him as an African American student. *Spirit Lake Tribe of* Indians, 715 F.3d at 1092.

While again viewing the facts in the most favorable light for the Motons, their allegations are simply insufficient to establish a prima facie case of discrimination.

### 4. Nellermoe's Alleged Use of a Racial Slur

Fourth, the Motons' allegation that Defendant Nellermoe used a racial slur is not sufficient to establish a prima facie case. The crux of the Motons' claim is that Nellermoe allegedly said "nigger" in one fashion or another. However, the exact use of the slur has repeatedly changed. In their discovery responses, the Motons claimed Nellermoe directly used the slur in reference to Jaedan. (Stoffel Decl., Ex. F, at ¶ 13.) Alonzo Moton later said that Nellermoe called him, and not Jaedan, the slur. (Stoffel Decl., Ex. B, at 98:18–23.) The story changed for a third time when Ray Kvalvog said he heard the slur being used as he and Alonzo were exiting the school and again for a fourth and final time when Kvalvog amended his story to match Alonzo's. (2nd Decl. Jason M. Stoffel Supp. Mot. Summ. J., Ex. G at 180-182, July 1, 2021, Docket No. 57.)

Despite the inconsistent stories and assuming that a slur was used in any of the above four fashions, that fact alone, although racially offensive and misguided, would not

be enough to establish that any actions taken by Nellermoe or PCS were racially motivated because the alleged slur was not made in connection with any of the allegedly discriminatory conduct. *Saulsberry v. St. Mary's Univ. of Minn.,* 318 F.3d 862, 867–68 (8th Cir. 2003) (finding that no reasonable jury could infer discriminatory intent from "an isolated, stray comment unrelated to the decisional process."); *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 934 (8th Cir. 2006) (noting that racially offensive statements that are isolated and unrelated to the decision-making process are not direct evidence of discrimination).

At most, the Motons have regularly provided only conclusory allegations that actions taken by Defendants were racially motived. While the Motons have established that they are in a protected class as African Americans and allege racial animus affecting a protected right, they simply have not demonstrated facts sufficient to establish Defendants' discriminatory intent such that their claims could survive summary judgment.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants Park Christian School and Chris Nellermoe's, individually and as principal of Park Christian School, Motion for Summary Judgment [Docket No. 38] is **GRANTED**.

-19-

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  March 29, 2022                              ____*John R. Tunheim*____
at Minneapolis, Minnesota.                                     JOHN R. TUNHEIM
                                                                     Chief Judge
                                                          United States District Court